HOWARD WISEMAN, APPELLEE, v. CARTER WHITE LEAD COMPANY, APPELLANT.

FILED DECEMBER 19, 1916.  No. 19039.

1. **Master and Servant:** DANGEROUS EMPLOYMENT: DUTY OF MASTER. Where a master employs a servant to work in a room in which the air is impregnated with poisonous dust and fumes, which, when inhaled, are liable to result in permanent or serious impairment of health, it is the duty of the master to fully caution the servant as to such danger and advise him as to the serious consequences that may result therefrom; and this duty is not fully performed by merely furnishing the servant an appliance to be worn over the mouth and nose for the purpose of preventing or minimizing such danger, without instruction as to the danger of failure to constantly wear the same. Nor will the master be excused from the performance of such duty by the fact that the servant may have some degree of knowledge of the dangerous character of the employment, but does not understand or fully appreciate its nature or extent, or the serious consequences liable to result therefrom.

2. **Evidence** referred to in the opinion examined, and *held* sufficient to sustain the verdict.

3. **Instructions** referred to in the opinion examined, and *held* free from error.

APPEAL from the district court for Douglas county: CHARLES LESLIE, JUDGE. *Affirmed.*

*Montgomery, Hall & Young,* for appellant.

*Gurley & Fitch, contra.*

FAWCETT, J.

From a judgment of the district court for Douglas county, in favor of plaintiff, in an action for personal injuries, defendant appeals.

The petition alleges that plaintiff commenced work as a laborer in defendant's plant at East Omaha, June 24, 1913; that, in the process of manufacturing white lead, poisonous dust permeates the air, making work. dangerous for those working therein, but plaintiff was not aware of such danger, and was not informed thereof by defendant; that plaintiff was poisoned by the lead fumes, and contracted plumbism, which caused him to become permanently sick, and to suffer pains incapacitating him for work, all to his damage in the sum of $10,000. The answer denies all allegations in the petition, and alleges that, if plaintiff suffered injuries from his work, the same were caused by his failure to exercise ordinary care for his own safety, his failure to properly wear and use the appliances furnished by defendant to prevent the inhalation of poisonous dust and fumes, and in failing to observe the instructions and rules of the defendant for the safeguarding of his health, and that his injuries, if any, are and were owing to his own carelessness and negligence; that plaintiff was informed of all dangers and risks of the work, and that these were obvious and known to him; that he therefore assumed all risk while engaged in the work; that the appliances furnished him were those in general use in lead factories, and were fit and proper to conserve his health if he had exercised due care for his own safety. The reply was a general denial. The jury returned a verdict in favor of plaintiff for $2,500, upon which judgment was entered.

The errors assigned are: (1) That the court erred in refusing at the close of the evidence to direct a verdict for the defendant, as such evidence shows that plaintiff assumed all risk of injury from lead poisoning while working in defendant's factory; (2) that the court

erred in giving instruction No. 4; and (3) that the court erred in its assumption in instruction No. 2 that there was any evidence whatever "that the defendant had knowledge or notice that the plaintiff was inexperienced in such work and did not know and appreciate the dangers thereof, if such dangers existed."

1. The evidence shows that plaintiff had formerly worked on a farm. On leaving the farm he obtained employment in the city of Omaha as a teamster. Later he obtained employment with the defendant. His first work was unloading coal for the company in the company yards. He then worked at handling pig lead bars, and a few days later was set to work in the blow room of the factory, firing a kettle where lead was boiled and blown. In this room the air was at all times more or less poisoned with lead fumes and dust. As to his employment in the blow room, he testified, substantially, that one of the men employed in that room quit work, and that in a conversation with the foreman who hired him "he asked me if I could handle that upstairs. I told him I didn't know; I never tried it; knew nothing of it. He says, 'You go up there in the morning. Go up this evening and put in the shingle so the night man' would build me a fire for the next day." He says he went up and put in the shingle as directed, and the next morning went to work in the blow room. When asked to describe the apparatus with which he worked, he answered: "A. Well, it is a kettle. The lead comes up on the carrier and is dumped into the kettle, and we have got to keep it so hot—the difference in the lead; some you will keep 700 degrees, and as high as 900, 950. You have a thermometer to go by. * * * Q. Describe the apparatus you call kettle a little more fully. A. Well, it is a large kettle. I don't know just what size it is. It stands up on a— well, kind of a foundation, and there is a nozzle in it goes into the tank, when the lead is hot it goes out that. You have a plug. You plug that up when you stop,

and when you pull the plug it goes out in there. It is blowed with 100 pounds by something. It is blowed into the tank, and you have three steps, a stairway of three steps you get up on to skim the dross off the kettle. You have got to keep the dross skimmed from the kettle." He testified that the kettle stands "better than waist high when you are on the floor by it there." He further testified that, before going to work in the blow room, he did not know anything about the disease called "plumbism" or lead poisoning, and that no one at the plant said anything to him, before he went at that work, about such a disease; that no one said anything to him about any danger connected with the work or contracting the poison. This testimony is controverted by the testimony of the foreman. The evidence further shows that the men engaged in that work were furnished with respirators, or "muzzles" as some of the witnesses called them. This appliance was worn over the mouth as a protection, defendant insists, against the inhalation of lead dust. Plaintiff testified that he knew it was dusty and dirty in the blow room, but did not think there was any danger from breathing the lead dust. There is some evidence that on two or three occasions he was seen without the respirator on, and was warned to put it on. His testimony is that he wore it at all times except when he went to a window for fresh air. These were all questions for the jury. Without recounting the testimony further, we cannot say that the trial court erred in holding it sufficient to warrant the jury in finding that plaintiff was set to work in the blow room under these dangerous conditions without sufficient warning or instruction from the defendant as to the latent danger incident to his employment, viz., the danger of lead dust or fumes causing the very serious disease which he subsequently contracted.

2. The complaint of instruction No. 4, covered by the second assignment, is that there was no evidence

that defendant knew plaintiff to be inexperienced in such work, and that it was error to give an instruction which implies that there is evidence from which the jury may find a fact of which there is no evidence before them. We think the evidence which we have outlined under the first assignment, as to what plaintiff said to the foreman when he was told to commence work in the blow room, is a sufficient answer to this complaint of instruction No. 4. In the light of that testimony, we do not think it can be held that "there was no evidence that defendant knew plaintiff to be inexperienced in such work."

3. The complaint under the third assignment is that the court erred in its assumption in instruction No. 2 that there was any evidence "that the defendant had knowledge or notice that the plaintiff was inexperienced in such work and did not know and appreciate the dangers thereof, if such dangers existed." Regardless of whether or not this would constitute a defense, it involves the consideration of conflicting evidence, which we feel constrained to hold is disposed of by the finding of the jury. It must be conceded that plaintiff knew that the conditions existing in the blow room were unusual. The fact that the men were wearing respirators, and that he also wore one, was sufficient to advise him of that fact, but, if his testimony is to be believed, he did not thereby know or realize that the inhalation of the lead fumes or dust would render him liable to contract the serious disease with which he was subsequently afflicted, and which the evidence shows he was liable to contract if he did not make a proper use of the appliances furnished. Under the authorities cited by appellee, plaintiff was not required to show entire ignorance of the danger to which he was exposed. He was entitled to a verdict and judgment if he satisfied the jury that he had some degree of knowledge of the dangerous character of the employment, but did not understand or appreciate its full nature or

extent.  As said by the supreme court of California, in *Pigeon v. Fuller,* 156 Cal. 691: "He may, for example, have observed that the melted pig lead gave off fumes, and that dust arose from the white lead in the process of manufacture, and that this involved the possibility of some degree of discomfort or injury, without realizing or understanding that the very serious disorders from which he claims to be suffering were a probable consequence.  In the face of appellant's contention, strongly urged even on appeal, that there is no danger in the employment in question, it can hardly be claimed that the plaintiff must, as matter of law, be held to have known that the inhalation of the fumes and dust had a tendency to produce lead poisoning, with its accompaniment of loss of teeth, paralysis and derangement of the digestive organs.  This is not a fact of universal knowledge, nor was it necessarily apparent to one employed, even for a long time, in defendant's works.  The risks assumed by a servant are only the ordinary risks of the employment.  He does not assume the risk of hidden dangers which are, to the knowledge of the master, not apparent to him.  (Citing cases.) There was ample evidence to warrant a finding that plaintiff, by reason of his prior experience, knew that some risk attached to work in a white-lead factory, but that, until he was suddenly stricken down, he had no conception of the real character or extent of the danger which he incurred."  This discussion by the California court so aptly fits the case under consideration here that we deem further discussion unnecessary.

Finding no reversible error in the record, the judgment of the district court is

AFFIRMED.