FRED AHRENS, APPELLEE, V. AMERICAN SMELTING & REFIN-
ING COMPANY, APPELLANT.

272 N. W. 235

FILED MARCH 26, 1937. No. 29866.

*Crofoot, Fraser, Connolly & Stryker,* for appellant.

*Johnsen, Gross & Crawford, contra.*

Heard before GOSS, C. J., ROSE, DAY, PAINE and CARTER, JJ., and ELDRED and CHASE, District Judges.

CHASE, District Judge.

In this action the plaintiff, as an employee of the defendant, seeks to recover damages resulting from plumbism, or lead poisoning, which he claims to have contracted while employed by the defendant. The jury returned a verdict for the plaintiff, and from a judgment thereon the defendant has appealed to this court. At the close of the testimony the defendant moved for a peremptory instruction,

based upon the insufficiency of the evidence. The overruling of this motion by the trial court is one of the principal assignments of error.

The plaintiff seems to base his right of recovery upon two specific acts of negligence, (a) that he was employed by the defendant in connection with the smelting and refining business, and that such business is extremely hazardous and dangerous to its employees, and that the defendant negligently failed to provide a safe place for the performance of his duties; (b) that the defendant failed to warn and admonish him as to the hazards in connection with his employment, known by the defendant, of which the plaintiff was ignorant.

The answer admits the relationship of master and servant, but alleges that every reasonable precaution was employed to make the premises safe for its men to perform their work, and alleges further that it fully admonished and warned the plaintiff that there was likely to result from such employment the occupational disease known as lead poisoning, or plumbism, and informed plaintiff of the nature and results thereof.

Our consideration of the matter will be confined to the proposition as to whether the evidence is sufficient to support a verdict.

The facts are not seriously in dispute except in two or three particulars. The plaintiff was born and reared on a farm. The extent of his education was the completion of the second year in high school. He was 26 years of age at the time he entered the employ of the defendant in its smelting and refining plant at Omaha, Nebraska, which was on the 3d day of November, 1933. At the outset he was engaged in the unloading from box cars lead plates taken from discarded automobile batteries. This service was performed by shoveling the plates into wheel barrows and conveying them thence to the defendant's plant. He performed this character of labor until February 17, 1934, at which time he was transferred to a part of the plant known as the tin furnaces. The purpose of these furnaces

is to recover lead chloride from slag which consists mainly of lead chloride and tin oxide. These furnaces are heated to a very high temperature in order to extract the refined products from the raw materials. The plaintiff as furnace tender was at times required to open the doors and stir this molten mass with an implement provided for that purpose. This smelting process oftentimes exhales lead oxide fumes which, if inhaled by workmen, are likely to produce very serious systematic disorders. In order to prevent as far as possible the escaping of fumes and gas, the defendant had provided various safety appliances which were attached to the furnaces. These consisted of a fan at the back located at the bottom of large metal tubes or conveyors. By the operation of this fan fumes or gases generated from the smelting process are sucked into these pipes and conveyed out of the furnace room into an adjoining room called the bag room. The latter room is equipped with many large cloth bags hanging from the ceiling, at the bottom of which the metal tubes are inserted. These appliances are designed to collect the dust and fumes coming from the furnaces into these bags which act as a filter and prevent their escape. There was a shelter or shield attached to the front door of the furnace, so shaped as to prevent dust and smoke escaping into the room upon the opening of the door. The plaintiff, as well as other workmen, was furnished with respirators for his use when working about the furnaces, and with a gas mask and coveralls when it became necessary to enter the bag room to remove the dust from the collecting filters.

On July 1, 1934, due to a partial shut-down of the plant, the plaintiff's employment was discontinued. On October 25, 1934, it was again resumed, at which time he was almost immediately transferred to a part of the refinery known as the bismuth plant. In this department he worked on the copper furnaces as tender. These furnaces were located in a spacious room which is provided with large doors and louvers for proper ventilation. The furnaces are used for the purpose of removing the refined copper from

slag. They have no doors. At the front a fan is attached to prevent the escape of dust and gases which generate in the refining process. The plaintiff, after tending the copper furnace for a short time, was transferred to the bismuth kettles which are located in a separate room adjacent to the copper-furnace room. This latter room is about 20 by 30 feet, open at the top for ventilation. In this room are three round bismuth kettles, about five feet in depth, each being covered by a cone-shaped lid resembling a funnel with the spout projecting upward through the roof so that any fumes, smoke or gases given off in this process will be discharged into the open air. The testimony shows that these appliances work very successfully except on rare occasions when the wind was in a certain direction, at which time some fumes did escape into the room. The plaintiff's work on the bismuth kettles continued about three months, and it was while so engaged that he first noticed a change in his physical condition.

Both at the time of his original employment, and when it was resumed, he was required to and did sign an agreement in which he stated that he would abide by all the rules and regulations of the company as to medical examinations and inspections, and would comply with the safety rules, admitting that he had received a copy thereof and was instructed to read them and familiarize himself with the same; that he had received warning and had knowledge that such employment was dangerous to his health, and that lead poisoning, or plumbism, oftentimes resulted from such employment; that such disease led to very serious consequences, such as paralysis and derangement of the digestive organs; that he would guard against such dangers; that he had read the agreement and understood it. In addition he was furnished with a book of rules of the company in which the dangers of the occupational disease of lead poisoning were pointed out in bold-faced type, informing him of the physical effects resulting therefrom. He was also informed that habits of cleanliness and a strict compliance with the rules and regulations would minimize

the dangers of such disease. He was instructed to keep his person and clothing clean. Monthly lectures, which he attended, were given the employees, at which were stressed the necessity for cleanliness, and the constant use of the appliances which had been furnished the workmen for their protection and the preservation of their health. Physical examinations were had at stated intervals by a physician employed by the defendant, as a means of detecting early any possible traces of lead poisoning. The testimony shows that this occupational disease, termed plumbism, may be acquired in two different manners—by lead dust or fumes being inhaled in the respiratory process, or by dermal absorption, due to a failure to keep the skin free from deposits of lead dust. The testimony shows that a few days previous to the trial the plaintiff was suffering from a mild form of this ailment. It further shows that the defendant had equipped its refinery with approved safety appliances used by other concerns in the prosecution of similar businesses.

The plaintiff testified that he knew he would be discharged if he were caught working where dust and fumes were present without using the respirator; that he received the safety rules; that he signed the agreement mentioned; and that the company had lectures in which he was informed of the dangers to health incident to his employment. He seems to rest his entire case upon the claim that he did not read these rules, notwithstanding he stated in the agreement that he had, and that he was never told by any one there was such a disease known as plumbism.

The contention that the defendant failed to provide the plaintiff a safe place to work is certainly disposed of by the fact that its plant seems to have been fully equipped with all the effective and necessary safety appliances which are known to such business.

This precise question was before this court in the case of *Wiseman v. Carter White Lead Co.*, 100 Neb. 584, 160 N. W. 985. In that case the verdict was upheld only because the evidence showed that the master had failed to

inform the servant of the nature and extent of the dangers and the serious consequences thereof. Had such information been given the servant, the court would have held him to have assumed all such risks.

The facts in the instant case indicate that the defendant must have had the *Wiseman* case in mind when it went to such extremities to inform plaintiff of the character and consequences of the disease of plumbism by its agreements, rules and lectures, and provided, as it did, an elaborate system of mechanical safety appliances.

Where an employer provides his plant with approved safety appliances to prevent the contraction of an occupational disease, and supplies the employee with safety devices, and warns him of the dangers of contracting plumbism or lead poisoning as a consequence of such employment, the master has performed his entire duty toward the servant; thereafter any damage the servant sustains by reason of contracting such disease will be held to have resulted from risks incident to such employment, which the servant has fully assumed. *Wiseman v. Carter White Lead Co., supra.; Grover v. Aaron Ferer & Sons,* 122 Neb. 755, 241 N. W. 539; *Pigeon v. Fuller & Co.,* 156 Cal. 691, 105 Pac. 976; *Glantz v. Chicago, B. & Q. R. Co.,* 87 Neb. 60, 127 N. W. 221; *Grant Storage Battery Co. v. DeLay,* opinion of Circuit Court of Appeals 8th Circuit, filed February 4, 1937.

The doctrine of assumption of risk is recognized by all the courts and often applied. The theory of the law in this connection being that such dangers were contemplated by the parties in determining the wages of the servant, and that the servant will then be held to carry his own insurance against any further damages growing out of the particular employment.

The plaintiff's claim that he did not read the rules nor understand the nature and consequences of the disease which might result from such employment is too ridiculous to be worthy of serious consideration. The record discloses him to be a normal individual, of more than ordinary in-

telligence. Under such circumstances, having signed his name to the agreement in which the hazards were pointed out, in the absence of fraud or duress, which he does not claim, the law conclusively presumes that he, being able to read, knows the contents thereof; and if he fails to read the same he is estopped to deny his lack of knowledge as to such contents. *Osborne v. Missouri P. R. Co.,* 71 Neb. 180, 98 N. W. 685; *Bradley & Co. v. Basta,* 71 Neb. 169, 98 N. W. 697; *Miller v. Gunderson,* 48 Neb. 715, 67 N. W. 769.

From a full consideration of the record, we must conclude that the plaintiff wholly failed to sustain the burden of proving actionable negligence, and the trial court committed error in overruling the defendant's motion for an instructed verdict. The judgment is, therefore, reversed and the action dismissed.

REVERSED AND DISMISSED.