EDWARD L. RZESZOTARSKI, ALSO KNOWN AS ED L. RESE, APPELLANT, V. AMERICAN SMELTING & REFINING COMPANY, APPELLEE.

277 N. W. 334

FILED JANUARY 21, 1938.   No. 30182.

*G. H. Seig,* for appellant.

*Crofoot, Fraser, Connolly & Stryker, contra.*

Heard before GOSS, C. J., EBERLY, DAY, PAINE, CARTER and MESSMORE, JJ.

MESSMORE, J.

This is an appeal from the district court for Douglas county. At the close of the evidence, the trial court sustained a motion by defendant for a directed verdict. From this ruling the plaintiff appeals.

Plaintiff's first cause of action was based on the factory act, citing section 48-403, Comp. St. 1929, in that defendant failed to furnish and provide proper fan, or other mechanical device, as would substantially carry away all dust and other impurities that might arise in the place of employment; set forth the employment engaged in by plaintiff; alleged that certain lead fumes were emitted from the cupola furnace attended by him, from which he contracted plumbism, or lead poisoning. In his second cause of action plaintiff alleged defendant failed to furnish him with a safe place to work, or with proper equipment for such work; and prayed for recovery of $2,995.

Defendant's answer admitted the operation of a smelting and refining factory; denied that the processes carried on by it involved great danger to persons employed in its plant; admitted the employment of plaintiff, and alleged that plaintiff was properly warned and instructed as to his employment, and failed to make use of the appliances and equipment made available to him by defendant; assumed the risk arising out of his employment, and was guilty of contributory negligence. Plaintiff's reply denied the right of defendant to rely upon the doctrine of assumption of risk or contributory negligence, as to that part of plaintiff's cause of action involving defendant's failure to comply with section 48-403, Comp. St. 1929, known as the factory act.

The evidence discloses that plaintiff was a man 34 years of age, had completed the sixth grade in school, had previously engaged in farming, and was unacquainted with

the work in which he was employed by defendant. He was employed on March 30, 1934. Two or three days thereafter he was. examined by defendant's physician and was put on the construction gang. He was given a respirator and a book of instruction on safety rules, which detailed the care to be used in and about his work. The plaintiff kept this book and read it, and, in addition, signed an agreement of employment that he would follow all rules and regulations of the company in the course of his employment. The defendant, being engaged in the smelting and refining business, where there is some danger of lead poisoning being contracted in certain parts of the factory, provides these safety rules and regulations for the protection of its employees.

Plaintiff continued for about a week in his first employment, shoveling battery plates from box cars. He wore his respirator, as instructed. He contends that in handling the lead battery plates there was considerable dust when the plates were shoveled into wheelbarrows, wheeled outside of the car, and dumped. Subsequent to this work the plaintiff helped to dig a ditch for a water main, in which work he was engaged for about a week. He was next employed in the foundry, where he stayed until he left the service in June, 1935. In the foundry he was started at shoveling sand as a helper, assisting with the furnace and in charging it, which means throwing scrap iron and pig iron into the furnace where it melts, and putting in a certain amount of coke with every 800 pounds of iron. Plaintiff worked in the foundry until the middle of August, 1934, when he was laid off for a week. Upon his return to, work he was given the job of cupola man; that is, he was required to take care of and charge the cupola furnace.

The foundry building is about 48 feet long and 59 feet wide on the ground floor, including two wings and an additional room 21 by 25 feet. There are 11 windows, each containing 18 panes of glass, 14 by 20 inches, each window measuring 5 by 7 feet, all of steel wall construction. These windows are located on the north of the foundry. On the

south are seven large and three small windows and a door; on the east five large windows and one small door, and on the west one large window, three medium and one small window. Such windows are equipped with ventilation tap capable of being opened, and when opened are tipped out and swing on a center pivot. The cupola furnace is located in about the center of the east and west way and on the north side of the main building of the foundry, is a round shaped iron pipe, set on four legs approximately three feet off the ground, the bottom of which is composed of a sheet-iron plate, with hinged doors to hold the charge as it is put in. It is brick-lined, and its inside diameter is about 30 inches. At the place of the fire, due to burning, the base is increased to about 36 inches. There is an opening in the roof of the factory through which a pipe extends from the cupola furnace. Under the furnace there is a fan which encourages the fire and drives the smoke and fumes of the fire through the stack to the outside of the building. The furnace is charged once in ten days for a period of three hours at a time. Pig and scrap iron are charged into the furnace, to be melted down for castings. The pig and scrap iron are on the outside of the foundry building proper and brought in, to be charged into the furnace. The plaintiff, in charging the furnace, stood at the furnace door about ten feet above the floor, with his head two or three feet from the ceiling of the building.

Plaintiff contends that when the furnace is charged the opening into which the charge is put emits a considerable .amount of fumes, some of which are caused by large jagged pieces of scrap iron and the manner in which they are lodged in the furnace, being the dust from other parts of the refinery; that is, on the pig and scrap iron that composes the charge, and which dust, plaintiff contends, is lead dust, and that when working on the outside of the factory he inhaled such dust; that it got into his clothing and on his person.

Located 60 feet northeast of the foundry is what is

known as the bag house. In this building are suspended long woollen bags for the purpose of catching fumes and dust which are brought to the bag house from the refinery through a large flue pipe which runs from the refinery several hundred feet away, past the north side of the foundry to the bag house. This flue pipe is a large tube, six feet in diameter, made of molded sheet and air-tight except that there are clean-out holes on the bottom, approximately 12 feet apart, which are opened twice a year for the purpose of cleaning out any dust that accumulates in the flue. At the northwest corner of the foundry is another opening which is not closed but kept open to admit cool air to cool off the gases as they proceed towards the bag house. Plaintiff contends that in this process the lead dust taken from the bag house to gondola cars blows over and settles on the iron outside of the foundry, to be used therein. The hole left open in the flue pipe is in close proximity to the foundry. It was the practice to take lead oxide in wheelbarrows and dump it into gondola cars, this work being carried on immediately outside of the foundry in which plaintiff worked, and in the immediate vicinity of the iron material that went into the foundry. The defendant now transfers the lead oxide from the bag house in carts, with canvas tops for the purpose of keeping the dust from blowing. The men engaged in this work are equipped with helmets, hip boots, rubber gloves, and other necessary appliances.

Plaintiff claims that the respirator furnished him was defective, and that he was told it need not be used in the foundry. He testified, in substance, that he wore the respirator when there was any dust and whenever he was told to wear it; that he was warned to wear it at all times when engaged in his work; that he did wear it three or four times when he worked in the foundry while they were digging out the kettles and once when he cleaned out the furnace; that when he went into the foundry he was admonished to get a clean pad for the respirator. There is evidence that some of the employees did not wear the

respirator in the foundry, and some evidence that the respirators were not needed. One witness, who had worked 18 years for the company in the foundry, wore his respirator when the material was poured into the molds from the furnace to make the castings. This caused a water gas or steam which will burn, and the men were required to take a hot iron rod and stick it into the sides of the sand mold, which caused this gas to burst into flames. This gas did not contain lead fumes. This witness testified that there is an air pressure from the fan underneath the furnace which makes an up-draft of 16 to 18 ounces of air, and that nothing comes out of the door except a few sparks; that wind carries the smoke and gas outside through the stack.

The evidence in behalf of the plaintiff, relative to the respirator and its defects, is not impressive, when we consider the fact that the appliance furnished him was one of standard make, and, if defective in any manner, he could have obtained, for the asking, a new one, or the parts thereof that might be required. There is no smelting or refining of lead carried on in the foundry where the plaintiff worked.

The chemists testified that, where scrap and pig iron are used as a basis for casting, and assuming that such iron is covered with a certain amount of lead oxide, and taking into consideration the relative degree of heat required to melt lead and iron, any lead fumes that might be emitted from the furnace door when opened would be negligible.

The defendant company held monthly meetings to instruct its employees on safety and cleanliness and how to guard against lead poisoning. The employees were examined monthly by the company physician to ascertain whether any symptoms of lead poisoning were present. At the time of plaintiff's illness, he was attended by the company physician and his assistant; was visited by the superintendent or personnel officer of the factory and was examined by another physician; was confined in a hos-

pital, examined by another doctor for defendant; later treated by still another physician, not connected with the company, who taped his back, and, lastly, was treated by a doctor who diagnosed his disease as lead poisoning. The other physicians made no such diagnosis.

Plaintiff contends that the trial court was in error in directing a verdict in favor of the defendant, for the reason that defendant violated section 48-403, Comp. St. 1929. Plaintiff cites several cases wherein the violation of a statute imposing a duty on an employer to furnish certain safety devices and machinery and provide employees with a safe place in which to work constitutes negligence *per se*. *McCarthy v. Village of Ravenna*, 99 Neb. 674, 157 N. W. 629; *Butera v. Mardis Co.*, 99 Neb. 815, 157 N. W. 1024; *Walker v. Klopp*, 99 Neb. 794, 157 N. W. 962; *Stevens v. Luther*, 105 Neb. 184, 180 N. W. 87; and for violation of a city ordinance, holding to the same effect, *Tralle v. Hartman Furniture & Carpet Co.*, 116 Neb. 418, 217 N. W. 952.

The cases cited are distinguishable from the case at bar, in that the facts in each of the cases disclose the violation of a statute, while in the instant case the evidence discloses that the defendant has complied with the statute.

Section 48-403, Comp. St. 1929, reads as follows: "If in any of the aforesaid places (which would include defendant's factory), any process is carried on by which dust or fumes are caused, which may be inhaled by the persons employed therein, or if the air should become exhausted or impure, there shall be provided a fan or other such mechanical device as will substantially carry away all such dust or fumes or other impurities, subject to the approval of the department of labor."

After a careful reading of the section above quoted, we believe that the words "substantially carry away all such dust or fumes or other impurities" mean to carry away such dust, fumes or other impurities to a high degree. The foundry in question was well ventilated; the fan under the furnace was capable of forcing and did force the fumes and smoke, in a very large degree, through the

stack to the outside of the building. The testimony of the chemists conclusively shows that very little, if any, lead dust is on the scrap and pig iron that are charged into this furnace. Relative to the respirator, some of the men did not wear them in the foundry. One witness in particular wore his respirator only on occasions. The warnings and instruction given to the plaintiff at the time he assumed employment would seem to be complete.

In *Grant Storage Battery Co. v. De Lay,* 87 Fed. (2d) 726, it was held: "In action for lead poisoning by employee in storage battery factory where dust and fumes were caused which might be inhaled, defendant had burden of showing that installation of fan or other device for carrying away dust and fumes as required by Nebraska statute was not practicable," citing section 48-403, Comp. St. 1929.

The above holding does not mean that a factory is not properly equipped, in the first instance, for the work carried on therein, where the evidence discloses that it has complied, as nearly as practicable, with the statute, and has been inspected about twice a year by the department of labor, with such department making no additional requirements. We cannot start with the premise, in view of such facts and circumstances, that the equipment and appliances of the foundry in question are inadequate. In *Grant Storage Battery Co. v. De Lay, supra,* the facts indicate that plaintiff worked in a dangerous place, without any apparent protection for his safety. Such is not true in the case at bar for the reasons hereinbefore given. It will be noted that in *Grant Storage Battery Co. v. De Lay, supra,* the court held that the defendant was not an insurer of the safety of the place in which the plaintiff was working, but was required only to exercise ordinary care in furnishing him a safe place in which *to work.* And it was likewise required to exercise only ordinary care to warn and instruct him as to the dangers of his occupation that were not obvious. The court in that case also held: "Where appliance furnished employee to protect him from lead

dust and fumes was of standard make and in common use, and had adequately protected employees for many years; and there was no substantial evidence that there was any defect therein, or that any better type was known, issue of negligence in not furnishing proper appliance should not have been submitted to the jury." We believe that the above case conclusively and properly states the rule in Nebraska.

The case of *Ahrens v. American Smelting & Refining Co.*, 132 Neb. 460, 272 N. W. 235, states the rule as follows:

"A servant accepting the employment of the master assumes all ordinary risks and dangers incident to his employment, or the conditions under which his work is performed, which are known to him or, in the exercise of ordinary care, would be apparent and obvious to persons of his experience, intelligence or understanding.

"When a master who operates a smelting and refining plant equips such plant with approved safety appliances and orders a servant to wear a respirator furnished by the master; instructs him generally as to the danger of contracting the occupational disease known as plumbism; informs him of the manner in which such disease may be contracted, the nature and consequences thereof, the master will not be held liable in damages to such servant who contracts such disease while in the employ of the master."

It is contended by plaintiff that the *Ahrens* case, above cited, did not involve the factory act. Regardless of this, the law in that case is acceptable as to the duties and obligation of an employer, such as the defendant in the case at bar, in providing for the care and safety of its employees. We believe that the defendant in the instant case took every necessary precaution for the safety of the plaintiff in the foundry in which he worked.

In *Wiseman v. Carter White Lead Co.*, 100 Neb. 584, 160 N. W. 985, cited by plaintiff, it is apparent that the employee was not properly warned and that the necessary precautions had not been taken. That case is not analogous

to the case at bar where no such risk as in the *Wiseman* case was evident, and the rule as stated in the *Wiseman* case is correct.

To hold that defendant should be required to place ventilating fan or mechanical device in the foundry in which plaintiff worked, other than the equipment which existed there at that time, and in view of the instruction that the plaintiff received relative to lead poisoning, with no further proof than was made by plaintiff, would be tantamount to imposing on defendant a duty that would be unreasonable of performance. Some reasonable duty should be imposed upon the employee, and every employee should assume to follow carefully and considerately the regulations made by the employer necessary and incident at least to a reasonable performance of his duties as an employee.

Section 48-403, Comp. St. 1929, requires an employer's equipment in a foundry to be approved by the department of labor. The evidence discloses that a representative of that department had visited defendant's foundry, where the plaintiff worked, during its operation, and that no recommendation as to any or further equipment, which might be necessary to comply with the section of the statute quoted, was made by such representative to the defendant.

The trial court, in directing a verdict in behalf of the defendant and against the plaintiff on the evidence adduced on the two causes of action, as pleaded by the plaintiff in his petition, was correct.

AFFIRMED.